**SIGNED THIS: February 28, 2020**

_____
**Mary P. Gorman
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re | ) |
| | ) Case No. 18-71744 |
| JOSEPH T. THORNTON, Jr., | ) |
| and NICOLE THORNTON, | ) |
| | ) Chapter 7 |
| Debtors. | ) |
| _____ | ) |
| | ) |
| AMBASSADOR STEEL | ) |
| FABRICATION, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. No. 19-07008 |
| | ) |
| JOSEPH T. THORNTON, Jr., | ) |
| | ) |
| Defendant. | ) |

**O P I N I O N**

Before the Court, after trial, is a complaint to determine the dischargeability

of a debt allegedly owed by the Debtor to Ambassador Steel Fabrication, LLC ("Ambassador"). For the reasons set forth herein, judgment will be entered in favor of the Debtor and against Ambassador. No debt to Ambassador will be excepted from the Debtor's discharge.

## I. Factual and Procedural Background

Joseph T. Thornton, Jr. ("Debtor") and his spouse, Nicole Thornton, filed a voluntary petition under Chapter 7 on November 29, 2018. Relevant to the matter here, the Debtor disclosed on his statement of financial affairs that he was an owner of Thornton Rave Steel Fabrication LLC ("Thornton Rave"), which had operated from 2014 until November 2018. On his Schedule A/B, the Debtor valued his 99% interest in Thornton Rave at zero. On his Schedule E/F, he listed a number of creditors, including Ambassador, by reason of "possible personal liability" related to his operation of Thornton Rave and other businesses. Both the Debtor and his spouse received a discharge on March 19, 2019. Prior to the entry of the discharge, however, Ambassador filed a timely complaint to determine the dischargeability of a debt allegedly owed to it by the Debtor.

In its complaint, Ambassador asserted that Thornton Rave was in the business of fabricating and supplying reinforced steel material for concrete construction and sold reinforced steel and other related materials to contractors for use in construction projects. Ambassador alleged that it supplied Thornton Rave with steel materials for use in Thornton Rave's business. Further, Ambassador claimed that it had entered into joint check agreements with Thornton Rave and several of Thornton Rave's customers to require that payments

for materials supplied by Ambassador would be made jointly to Thornton Rave and Ambassador. Notwithstanding those agreements, Ambassador says that, during October 2018, the Debtor caused three joint checks to be deposited into the Thornton Rave bank account without the endorsement of Ambassador, causing Ambassador to be deprived of $77,953.22 in payments due to it. Ambassador claimed that the Debtor was liable to repay that amount to Ambassador and that the debt should be found nondischargeable because his conduct constituted embezzlement of or willful and malicious injury to Ambassador's property. Copies of the three joint checks were attached to the complaint as exhibits.

The Debtor answered the complaint denying many of the material allegations against him. Specifically, he denied that he was personally indebted to Ambassador and claimed that the debt was owed only by Thornton Rave. He affirmatively admitted that the joint checks had been deposited into a Thornton Rave account and that the funds were used to pay Thornton Rave bills. Somewhat strangely, he also affirmatively admitted that he, as manager of Thornton Rave, had endorsed the joint checks before they were deposited even though the checks did not contain any such endorsements.

The matter was tried on January 14, 2020. Ambassador presented Laura Rackowski, who identified herself as its credit manager, as its first witness. Ms. Rackowski said that she was responsible for collections and for reviewing and assessing the terms of credit applications. She said that she was familiar with the credit relationship between Ambassador and Thornton Rave, which had begun in March 2017 when Thornton Rave began purchasing steel from Ambassador.

Initially, Thornton Rave made its purchases from Ambassador on open account, but, after issues of timely payment arose, it was put on a cash-on-delivery program. When the logistics of that program became cumbersome, joint check agreements were put into use.

According to Ms. Rackowski, joint check agreements were entered into with Thornton Rave and a number of its customers to require those customers to include Ambassador as a payee on checks issued to pay Thornton Rave invoices. She said that Thornton Rave agreed to the arrangement because it allowed Thornton Rave to continue to purchase steel from Ambassador.

Ms. Rackowski identified a joint check agreement Ambassador entered into on May 24, 2018, with Thornton Rave and its customer, Sangamo Construction. The joint check agreement referenced a Galesburg project and required Sangamo Construction to issue joint checks in payment of Thornton Rave invoices for steel related to that project. Further, Sangamo Construction guaranteed payment on all invoices issued by Ambassador to Thornton Rave related to the project.

According to Ms. Rackowski, Ambassador received one check pursuant to the agreement, but, when more payments were not forthcoming, Ambassador made an inquiry to determine the status of payments. Sangamo Construction provided Ambassador a copy of a cancelled check dated October 3, 2018, payable to both Thornton Rave and Ambassador in the amount of $18,962.42. The check was not endorsed by either payee but contained a stamp from PNC Bank guaranteeing the absence of endorsement. Ms. Rackowski said that Ambassador had never received the check. She acknowledged, however, that Sangamo Construction had taken some action through the banking system to recover on the

check paid without endorsement, and she believed that Ambassador had later been paid about $16,000 from Sangamo Construction.[1]

A joint check agreement dated May 17, 2018, entered into by Ambassador, Thornton Rave, and D Construction, was also identified by Ms. Rackowski. The agreement related to a Kankakee bridge replacement project, required D Construction to issue joint checks for Thornton Rave invoices, and provided that D Construction guarantee payment of Ambassador's invoices related to the project. Ms. Rackowski said that three payments were received from D Construction pursuant to the agreement, but, when the account was not paid in full, Ambassador inquired about the status of payments. D Construction then provided a copy of a cancelled check dated October 16, 2018, payable to Thornton Rave and Harris Rebar in the amount of $48,796.30.[2] According to Ms. Rackowski, the check, which contained no endorsement, had never been received by Ambassador and Ambassador had never received the proceeds of the check from either Thornton Rave or D Construction.

Ms. Rackowski also identified a joint check agreement entered into by Ambassador on June 13, 2018, with Thornton Rave and Illinois Constructors. The agreement referenced the Metra Z project and, like the other agreements, required Illinois Constructors to issue joint checks for steel supplied by Ambassador and

---

[1] Ambassador's attorney later confirmed by stipulation that the actual amount received from Sangamo Construction was $17,337.89, leaving a balance due from the unendorsed check of $1624.53. This, in turn, brought the total claimed debt down to $60,615.43 from the $77,953.22 alleged in the complaint.

[2] Ms. Rackowski said that Harris Rebar was a related entity to Ambassador and customers often confused the two. In fact, the joint check agreement with D Construction was on letterhead of Harris Rebar. The Defendant did not raise any defense that the check payable to Harris Rebar was not subject to the joint check agreement.

to guarantee payments of Ambassador's invoices related to the project. She also identified a copy of a cancelled check dated October 19, 2018, payable to Thornton Rave and Ambassador in the amount of $10,194.60, which she said had been obtained from Illinois Constructors when an inquiry had been made by Ambassador about invoice payments. The check was not endorsed by either payee but contained the same PNC Bank stamp guaranteeing payment in the absence of endorsement. Ms. Rackowski said that Ambassador had never received the funds represented by the check from either Thornton Rave or Illinois Constructors.

Under cross-examination, Ms. Rackowski acknowledged that she had never discussed the terms of any of the joint check agreements with anyone at Thornton Rave and she did not know who else, if anyone, at Ambassador would have done so. She also admitted that she had not discussed with anyone at Thornton Rave the circumstances under which the Sangamo Construction, D Construction, and Illinois Constructors checks had been deposited by Thornton Rave without endorsement.

Ms. Rackowski also identified three other checks issued pursuant to joint check agreements to Thornton Rave and either Ambassador or, its related entity, Harris Rebar. The checks included one dated November 1, 2018, from G.M. Sipes in the amount of $33,746.71, another dated November 1, 2018, from The Kilian Corporation in the amount of $9,792.53, and the third dated October 21, 2018, from Sangamo Construction in the amount of $37,255.91.[3] None of the checks

---

[3] Ms. Rackowski said that this payment from Sangamo Construction was for a different project than the one associated with the Sangamo Construction check she had previously identified. The Debtor did not contradict that assertion.

contained the endorsement of either payee. Ms. Rackowski said that the checks would have been mailed by Thornton Rave to Ambassador's administrative office and then scanned for deposit. She admitted that all three checks should have been endorsed by both payees before deposit but said that the person doing the scanning for Ambassador would not have known to look for such endorsements.

The Debtor was also called as a witness by Ambassador. He stated that Thornton Rave's business was to supply fabricated steel rebar for bridge and road construction. He acknowledged that Thornton Rave bought steel from Ambassador to use in its fabrication process. He admitted that he was the person at Thornton Rave who ran the operations and that he was responsible for managing the business affairs of the company.

The Debtor acknowledged that Thornton Rave had entered into as many as 25 different joint check agreements with Ambassador and that he understood that the agreements were necessary for Thornton Rave to continue to be supplied with steel products by Ambassador. He understood that the agreements required Thornton Rave's customers to issue joint checks to make sure that Ambassador was paid for the materials it was supplying. He said that when joint checks were received by Thornton Rave, the checks were endorsed and mailed to Ambassador, but he admitted that some joint checks "slipped through."

According to the Debtor, when checks were received at Thornton Rave, checks payable to Thornton Rave alone were put in a bank bag and subsequently deposited. Joint checks were mailed to Ambassador. He said that various people at Thornton Rave were responsible for checking the mail and either banking or forwarding the checks. The Debtor identified the three checks from Sangamo

Construction, D Construction, and Illinois Constructors and acknowledged that those checks had not been forwarded to Ambassador but had been deposited into Thornton Rave's account. The Debtor said that he did not recall endorsing the checks, but, when shown a copy of his answer to the complaint wherein he admitted the allegation that he had endorsed the checks, he said that he was not disputing the fact that he endorsed the checks for Thornton Rave.[4]

The Debtor admitted that Thornton Rave ceased its business operations in November 2018. He said that the company was losing money due to the high cost of steel, the requirement by Ambassador that Thornton Rave buy steel in larger bundles than needed, and costly mistakes made by his employees.

Under examination by his own attorney, the Debtor said again that he had no specific recollection of how the three checks at issue had been processed at Thornton Rave. More than one employee was involved in the process of opening mail and taking checks to the bank. He also confirmed that, from June 2018 through November 2018 when the business closed, he did not take a salary or draw from Thornton Rave.

After the witness testimony, Ambassador's attorney moved for the admission of its exhibits consisting of the three joint check agreements and the three checks identified by Ms. Rackowski. The exhibits were all admitted without objection. Likewise, the Debtor's attorney moved for the admission of the three checks identified by Ms. Rackowski during her cross-examination. They were also admitted without objection. Ambassador's attorney then moved for the admission

---

[4] Again, the admission by the Debtor of endorsing the checks is confusing because the checks do not contain the endorsement of Thornton Rave.

of copies of Interrogatories propounded by Ambassador to the Debtor and the Debtor's answers to the Interrogatories. When the Court inquired why they would be admissible when they had not been used for impeachment or to refresh the Debtor's recollection, he asserted that they contained admissions. Somewhat surprisingly, the Debtor's attorney said that he did not object to the documents being admitted, and, accordingly, the Court admitted the documents for whatever they might be worth. The Debtor's answers to the Interrogatories were consistent with the Debtor's trial testimony that he does not recall which Thornton Rave employees dealt with the three checks at issue. He does admit, however, that, as manager of Thornton Rave, he was responsible for directing the use of the funds to pay Thornton Rave bills after the checks were deposited.

After the exhibits were admitted, the attorneys provided closing arguments and citations to authority. The matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a debt is a core proceeding. 28 U.S.C. §157(b)(2)(I)). The issues here arise from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

Ambassador seeks to have the debt it claims the Debtor owes it excepted from the Debtor's discharge. Generally, exceptions to discharge are construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000). The statutory exceptions to discharge should be "narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chicago v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001); *see also Lamar, Archer & Cofrin, LLP v. Appling*, __ U.S. __ , 138 S. Ct. 1752, 1758, 201 L. Ed. 2d 102 (2018). A creditor seeking to except a debt from discharge bears the burden of proving each element of its cause of action by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991). Before reaching the merits of the causes of action pleaded here, however, the threshold issue of whether the Debtor even owes a debt to Ambassador must be considered.

*A. Ambassador failed to prove that the Debtor owes it a debt.*

Ambassador claims that the debt owed by Thornton Rave to it should be excepted from the Debtor's discharge. But to achieve that result, Ambassador must show that the Debtor individually owes the debt. Ambassador produced no documents or other evidence that the Debtor guaranteed the debt of Thornton Rave and never made the argument that a guarantee exists. Instead, Ambassador claimed that the Debtor was liable due to his conduct in managing Thornton Rave. To establish the Debtor's liability on that basis, however, Ambassador would have had to pierce the veil of Thornton Rave, and it failed to do so with the evidence it

presented.

Both the Debtor and Ambassador have described Thornton Rave as an Illinois limited liability company, and the Debtor has admitted to being the manager and principal member of the company. Under Illinois law, members and managers of limited liability companies are "not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." 805 ILCS 180/10-10(a). Further, "[t]he failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or mangers for liabilities of the company." 805 ILCS 180/10-10(c). Notwithstanding these broad statutory protections for members and managers of limited liability companies, Illinois courts have held that veil-piercing of limited liability companies may be allowed based on theories of alter ego, fraud, or undercapitalization. *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 960 (2008) (reversing the dismissal of a veil-piercing action against a member of a Delaware limited liability company but finding that the result would the same under Illinois law); *Dass v. Yale*, 2013 IL App (1st) 122520, ¶¶36, 44, 44 n.7 (sustaining dismissal of an action against limited liability company manager where no allegations to support veil-piercing were made). Bankruptcy courts in Illinois, including this Court, have also held that veil-piercing of limited liability companies based on allegations of alter ego, fraud, or undercapitalization may be allowed. *See Denmar Builders, Inc. v. Suhadolnik (In re Suhadolnik)*, 2009 WL 2591338, at *4 (Bankr. C.D. Ill. Aug. 20, 2009); *Brown v. Real Estate Resource Mgmt., LLC (In re Polo Builders, Inc.)*, 388 B.R. 338, 384

(Bankr. N.D. Ill. 2008); *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 863 n.6 (Bankr. N.D. Ill. 2006).

Under Illinois law, veil-piercing generally requires a finding of such "unity of interest and ownership" between an individual and an entity that their legal separateness "has ceased to exist." *People ex rel. Scott v. Pintozzi*, 50 Ill. 2d 115, 128 (1971). Courts consider a variety of factors in determining whether a unity of interest or ownership exists, including undercapitalization, insolvency, disregard of formalities, absence of records, diversion of assets from the entity to the individual, commingling of funds, and whether the entity is merely a facade for the individual. *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503-04 (2005) (citations omitted).

Because of the statutory protections for members and managers of limited liability companies, some of the factors used to pierce the veil of corporations, such as lack of records and failure to observe all formalities, would not apply here. And, in any event, no evidence of a lack of records or any failure to observe the formalities required of limited liability companies was presented with respect to Thornton Rave. Likewise, no evidence was presented of any commingling or diversion of funds from Thornton Rave to the Debtor. To the contrary, the Debtor said he took no salary or draw for a number of months before the company closed. Finally, no evidence was presented about the initial capitalization of Thornton Rave or if and when Thornton Rave became insolvent. The Debtor said that Thornton Rave ceased business operations in November 2018, but what its exact condition was during the weeks before it was closed is not known. And although insolvency is a factor to be considered, the failure of a business, in and of itself,

is not determinative of whether the veil of a corporation or limited liability company should be pierced. If it were, then the veil of every failed entity could be pierced, and the limited liability associated with corporations and limited liability companies would be rendered meaningless.

Ambassador's attorney, without citation to authority, suggested that Thornton Rave's veil could be pierced and the Debtor held liable for the debt to Ambassador on the basis of fraud alone. Under Illinois law, veil-piercing is allowed when maintaining limited liability would "sanction a fraud or promote injustice." *Pintozzi*, 50 Ill. 2d at 128. But the type of fraud that cannot be sanctioned and compels veil-piercing arises when a corporation or limited liability company is used as the alter ego for an individual and such a unity of interest exists so that the separateness of the individual and the entity should be disregarded. *Id*. The type of fraud that supports veil-piercing exists when an entity such as a corporation or limited liability company is used as a sham. Here, as set forth above, none of the factors that might support the finding of a unity of interest or alter ego were proven by Ambassador. There was simply no evidence presented that would compel ignoring the separate existence of Thornton Rave and the Debtor.

Having found that the Debtor is not personally liable to Ambassador, the inquiry could end. In the interest of a complete review of the proceeding, however, a brief discussion of the causes of action will be undertaken.

### *B. Ambassador failed to prove embezzlement.*

Ambassador claimed that the Debtor had embezzled funds from it and that

the resulting debt should be excepted from discharge. 11 U.S.C. §523(a)(4). For dischargeability purposes, embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Matter of Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). To prove embezzlement, a creditor must prove that the debtor appropriated funds for his own benefit and that the debtor did so with fraudulent intent or deceit. *Id.* (citations omitted).

The evidence presented at trial established that Thornton Rave had lawfully come into possession of the three joint checks that should have been delivered to Ambassador but were deposited in the Thornton Rave bank accounts instead. But there was no proof that the Debtor appropriated the funds for his own use. The Debtor did not take a paycheck or a draw from the funds improperly deposited, and the only evidence presented was that the money from the joint checks was used to pay Thornton Rave's bills.

Likewise, there was no evidence of fraudulent intent or intent to deceive on the part of the Debtor. In his answer to the complaint, the Debtor admitted endorsing and depositing the three joint checks notwithstanding the fact that none of the checks were endorsed. In his trial testimony, the Debtor said that he did not recall who opened the mail and deposited the joint checks but acknowledged that he had taken responsibility for the actions in his answer. In the answers to Interrogatories submitted by Ambassador, the Debtor again denied recalling which of his employees had dealt with the joint checks and specifically denied knowing who had deposited the checks. He admitted, however, that, as the

manager of Thornton Rave, he made the decision to use the proceeds of the checks for the expenses of Thornton Rave. The Debtor was not asked if, when he used the funds to pay bills, he was aware that the funds had come from improperly deposited checks. Other evidence presented by the Debtor showed that, during the same period of time as when the joint checks were being deposited into the Thornton Rave account, other checks were being sent to Ambassador pursuant to the joint check agreements. Thus, no inference can be drawn that the Debtor made a decision to stop forwarding joint checks to Ambassador.

In his closing argument, Ambassador's attorney commented that one surprising thing he had learned during his preparation of the case was how little attention banks seem to be paying to the requirement that checks should only be processed for collection if they are endorsed by all payees. The Debtor's bank, Ambassador's bank, and at least five different banks of Thornton Rave's customers all processed checks at issue in this case without the endorsement of any payee. Generally, if a bank customer deposits a check payable only to the customer into the customer's own account, the depository bank may become a holder in due course of the instrument even in the absence of endorsement. 810 ILCS 5/4-205(1).[5] In processing the unendorsed check through the banking system, however, the original depository bank that accepted the check for collection must warrant to other collecting banks that the check was paid to the customer or into the customer's account. 810 ILCS 5/4-205(2). When a check has

---

[5] Illinois has adopted the Uniform Commercial Code. Citation to Illinois law here is, for all practical purposes, citation to the Uniform Commercial Code.

two or more payees, that required warranty cannot be made and banks generally must return such checks to the original depositor to obtain the endorsement of the other payees. Here, PNC Bank stamped two of the checks deposited by Thornton Rave with a guarantee of the absence of endorsement but apparently did not notice that its customer—Thornton Rave—was one of two payees on the checks. Accordingly, although PNC Bank could make the warranty required under §4-205(2) as to Thornton Rave, it could not make it as to Ambassador and therefore should not have processed the check. But it did. And Ambassador's bank similarly processed three other checks without Thornton Rave's endorsement.

A full discussion of the requirements for processing checks through the banking system is beyond the scope of this Opinion and is not needed to resolve the issues here. But the failure of the several banks to reject the unendorsed checks was the cause, at least in part, of the problems here. The Debtor said that he understood that the joint checks needed to be endorsed by both payees in order to be cashed. He never said that he had any expectation that unendorsed joint checks could be paid to Thornton Rave by depositing the checks without endorsement into Thornton Rave's account. He said that the three joint checks "slipped through" and were deposited instead of being sent to Ambassador. His testimony in that regard was credible and unrebutted. The testimony may have established sloppy procedures but not fraud or deceit.

Ambassador asks this Court to find that the deposit of the three unendorsed joint checks into the Thornton Rave account constituted embezzlement and fraud by the Debtor. At the same time, however, Ambassador's credit manager admits

that the person responsible for scanning checks for deposit at Ambassador is, most likely, not even trained to look for endorsements. And at least seven different banks processed the six joint checks payable to Thornton Rave and Ambassador or Harris Rebar in evidence here without noticing the missing endorsements. Under the circumstances, the Court cannot find that the Debtor's deposit of the unendorsed checks into the Thornton Rave account constituted embezzlement and fraud.

As set forth above, Ambassador failed to prove that the Debtor is personally liable to it for the debt of Thornton Rave. Even if the Debtor was personally liable, however, Ambassador also failed to prove the elements of embezzlement by a preponderance of the evidence. It failed to prove that the Debtor diverted the funds from the joint checks for his own benefit and failed to prove any fraudulent intent in the deposit of the joint checks into the Thornton Rave account. Judgment must be entered for the Debtor.

*C. Ambassador failed to prove a willful and malicious injury.*

Ambassador also claims that the debt owed to it by Thornton Rave should be excepted from the Debtor's discharge based on a theory of willful and malicious injury to Ambassador's property. This Court has already found that the debt is not owed by the Debtor and also finds that, even if it was, Ambassador failed to prove that the Debtor caused any willful and malicious injury to its property.

A debtor will not be granted a discharge for a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6). A party advocating for the nondischargeability of a debt under

§523(a)(6) must prove three elements: (1) that the debtor acted in a way to cause an injury to the creditor or the creditor's property, (2) that the debtor acted willfully, and (3) that the debtor acted maliciously. *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 722 (Bankr. N.D. Ill. 2002). The Supreme Court has determined that, in §523(a)(6), the word "willful" modifies the word "injury," thus nondischargeability requires "a deliberate and intentional *injury*, not merely a deliberate and intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Since *Geiger*, proof is required not only of an intentional act that caused harm but of an actual intent to cause the harm.

In his closing remarks, the attorney for Ambassador acknowledged that the evidence presented may well have fallen short of the proof needed to sustain this cause of action. The Court agrees. There was no evidence presented of any intent by the Debtor to cause harm to Ambassador. And having also failed to prove that the debt was owed by the Debtor in the first place, judgment must be entered for the Debtor.

## IV. Conclusion

Ambassador proved that Thornton Rave breached three joint check agreements by depositing three joint checks into its own account rather than forwarding the checks to Ambassador. But it proved no more than that. Ambassador failed to prove that the Debtor should be held personally liable for Thornton Rave's debt to Ambassador in the amount of those three checks. It also failed to prove that, even if the Debtor were personally liable for the debt, his conduct constituted embezzlement of Ambassador's property or willful and

malicious injury to Ambassador's property. Judgment must be entered for the Debtor on both counts of the complaint.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###